T.C. Memo. 1998-182


UNITED STATES TAX COURT


CARL W. AND BARBARA H. PATTERSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 10583-96.                    Filed May 18, 1998.


Carl W. Patterson and Barbara H. Patterson, pro sese.[1]

<u>Gregory M. Hahn</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ARMEN, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182.[2]

---

[1] At the trial of this case, petitioners were represented by <u>Robert E. Kovacevich</u>, an attorney admitted to practice before this Court.  After trial, however, Mr. Kovacevich was granted leave to withdraw as counsel, and petitioners filed their brief on a pro se basis.

[2] Unless otherwise indicated, all section references are to
(continued...)

Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1992 in the amount of $4,339.

The issue for decision is whether a certain loss, which respondent concedes is deductible, was incurred in 1992 as petitioners contend.

The amount of miscellaneous itemized deductions to which petitioners are entitled is a mechanical matter, the resolution of which is solely dependent on our disposition of the disputed issue.  See sec. 67(a).

## FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.  Petitioners resided in Lynnwood, Washington, at the time when their petition was filed with the Court.

Carl Patterson (petitioner) has been actively engaged in the commercial real estate market for approximately 40 years.

In 1990, petitioner began to consider the possibility of acquiring commercial real estate in Houston, Texas.  As part of his investigation of such property, petitioner learned that Skylane Apartment Projects (Skylane Apartments) was for sale by its owner, Darby Suiter (Mr. Suiter).

Petitioner requested and received from Mr. Suiter a picture and outline of Skylane Apartments.  Thereupon, petitioner began

---

[2](...continued)
the Internal Revenue Code in effect for 1992, the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

evaluating the investment potential of Skylane Apartments.  At the same time, petitioner also considered different options for obtaining real estate financing in Texas.  Shortly thereafter, petitioner traveled to Houston to visit Skylane Apartments.

On June 9, 1990, petitioner signed an "Earnest Money Contract" (the Earnest Money Contract) to purchase Skylane Apartments for $10,200,000.  Petitioner did not pay any money to Mr. Suiter upon execution of the Earnest Money Contract.

The Earnest Money Contract provided that the closing for the sale of Skylane Apartments was to occur on or before August 8, 1990, 60 days after the Earnest Money Contract was signed.  If the closing for the sale did not occur by that time, then the Earnest Money Contract provided that the parties would be released from the agreement.  In addition, the Earnest Money Contract was subject to the purchaser obtaining financing.

At the time that the Earnest Money Contract was signed, petitioner knew that real estate market conditions in Texas were poor and that it would be difficult to obtain financing for the purchase of Skylane Apartments.  Although petitioner pursued several different financing options, petitioner was unsuccessful in obtaining financing by August 8, 1990, and the sale of Skylane Apartments did not close.  Thus, the Earnest Money Contract expired on August 8, 1990.

Shortly after its expiration, petitioner requested that the Earnest Money Contract be reinstated without changes and the

closing date extended.  Mr. Suiter agreed to extend the deadline for the closing if petitioner signed an addendum to the Earnest Money Contract (First Addendum).  On August 30, 1990, petitioner signed the First Addendum, and the deadline for the closing was extended to October 19, 1990.

Pursuant to the First Addendum, the Earnest Money Contract was not subject to petitioner's obtaining financing.  Indeed, petitioner represented therein that financing had already been obtained.

The First Addendum required petitioner to tender $30,000 to the Stewart Title Co. to be deposited in escrow.  In the event of default by petitioner, the First Addendum provided that Mr. Suiter's sole remedy would be the receipt of the $30,000 deposit.

The First Addendum also contained certain disclaimers.  The First Addendum warned:

> SELLER IS CONVEYING THE PREMISES AS IS WHERE IS.  ALL WARRANTIES OF EVERY KIND WITH RESPECT TO THE PREMISES ARE HEREBY DISCLAIMED INCLUDING BUT WITHOUT LIMITING THE WARRANTY OF MERCHANTABILITY AND HABITABILITY. BUYER ACKNOWLEDGES THAT INFORMATION, FINANCIAL AND BUSINESS OPERATION RECORDS FURNISHED TO BUYER BY SELLER REGARDING SELLER'S BUSINESS OPERATIONS ARE WITHOUT WARRANTIES EXPRESS OR IMPLIED ALL OF WHICH IS DISCLAIMED.

The First Addendum also stated:

> Seller disclaims all representations and warranties of every kind regarding the premises, Seller's records, and/or Seller's business operations for the premises except those specifically stated in this Addendum.

Pursuant to the First Addendum, petitioner paid $30,000 to Stewart Title Co. Petitioner then continued to seek financing for the purchase of Skylane Apartments.

By October 19, 1990, petitioner was unable to obtain financing for the purchase of Skylane Apartments, and the Earnest Money Contract expired once again. At this time, petitioner thought that he still could obtain financing for the purchase of Skylane Apartments. Petitioner again convinced Mr. Suiter to extend the closing date of the Earnest Money Contract, this time from October 19, 1990 to November 19, 1990. As consideration for extending the closing date, petitioner agreed to tender to Mr. Suiter the $30,000 previously deposited in escrow with Stewart Title Co. By letter dated October 22, 1990, petitioner authorized Stewart Title Co. to disburse $30,000 to Mr. Suiter as consideration for extending the closing date of the Earnest Money Contract from October 19, 1990 to November 19, 1990.

Although petitioner continued to seek financing for the purchase of Skylane Apartments, petitioner was once again unsuccessful. The sale of Skylane Apartments did not close by November 19, 1990. Once again, petitioner requested that Mr. Suiter extend the closing date.

Mr. Suiter ultimately agreed to extend the closing date for an additional 30 days. However, Mr. Suiter required petitioner to sign a new addendum to the Earnest Money Contract (Second Addendum) and pay a $25,000 fee. In a letter dated November 20,

1990, Mr. Suiter, through his attorney William Boyd (Mr. Boyd), expressed some reluctance about agreeing to another extension of the closing date.  Mr. Boyd stated in his letter:

> Carl, Darby would prefer to terminate the Contract.  He is concerned that you will not be able to raise the down payment and thus lose the $25,000.00 extension payment.  You have insisted that you can close by December 19th.  Darby has reluctantly agreed to this extension but will not be inclined to grant further extensions.  Please consider all of this carefully before spending your $25,000.

In the same letter, Mr. Boyd indicated that Skylane Apartments were averaging 82-85 percent occupancy.  However, Mr. Boyd warned:

> You are required not to rely on this information but to conduct your own independent analysis of these matters.

Petitioner signed the Second Addendum and paid the $25,000 extension fee by money order dated November 26, 1990.  According to the Second Addendum, the sale price of Skylane Apartments remained at $10,200,000.  However, a cash downpayment in the amount of $2,550,000 was required, and the remaining portion of the purchase price was to be financed by Mr. Suiter.  Pursuant to the Second Addendum, the sale of Skylane Apartments was required to close by December 19, 1990.  In the event of default by petitioner, the seller's only remedy would be termination of the contract or specific performance.  In addition, the Second Addendum stated:

> Buyer has had ample opportunity to inspect the books and records of Seller and the premises and have

experts selected by Buyer to inspect the books, records and premises.  SELLER IS CONVEYING THE PREMISES AS IS WHERE IS.  ALL WARRANTIES OF EVERY KIND WITH RESPECT TO THE PREMISES, THE FINANCIAL CONDITION OF THE PREMISES, THE BOOKS AND RECORDS OF SELLER, PROFIT AND LOSS STATEMENTS, BALANCE SHEETS, ARE HEREBY DISCLAIMED INCLUDING BUT WITHOUT LIMITING THE WARRANTY OF MERCHANTABILITY AND HABITABILITY AND FITNESS FOR PURPOSE INTENDED. BUYER ACKNOWLEDGES THAT THE INFORMATION REGARDING SELLER'S BUSINESS WHICH HAS PREVIOUSLY BEEN FURNISHED BY SELLER TO BUYER DOES NOT CONSTITUTE A REPRESENTATION FOR ANY PURPOSE.  THE FINANCIAL BUSINESS OPERATION RECORDS OF THE SELLER ARE FURNISHED TO THE BUYER FOR INFORMATIONAL PURPOSES ONLY. BUYER AGREES THAT BUYER WILL HAVE ITS OWN INDEPENDENT AUDITORS, FINANCIAL EXPERTS, TAX ADVISORS, ATTORNEYS, ACCOUNTANTS TO REVIEW THE BUSINESS OPERATIONS AND BUYER WILL SATISFY BUYER'S SELF, WITHOUT RELIANCE UPON ANY INFORMATION BY SELLER, AS TO WHETHER BUYER INTENDS TO PURCHASE THE PROPERTIES OR NOT.

Shortly after signing the Second Addendum, petitioner and petitioner Barbara H. Patterson, together with their accountant, traveled to Houston to examine the financial records of Skylane Apartments.  Upon arriving there, petitioners were given access to Mr. Suiter's records regarding Skylane Apartments, including rent receipts and bank deposits.

By December 19, 1990, petitioner was unable to make the downpayment of $2,550,000, and the sale of Skylane Apartments did not close.  The Earnest Money Contract expired, and no additional extensions were granted.

On or before December 20, 1990, petitioner retained an attorney, John Trueheart (Mr. Trueheart), to seek recovery of the amounts paid to Mr. Suiter.

In a letter dated December 20, 1990, Mr. Trueheart demanded from Mr. Suiter a refund of $55,000 for the amounts paid (i.e., $30,000 + $25,000) for the extensions of the Earnest Money Contract.  In his letter, Mr. Trueheart alleged that "we have discovered significant discrepancies between income and expenses information you have provided Mr. Patterson and the actual operation and [sic] of the projects."  In addition, Mr. Trueheart alleged that the square footage attributable to Skylane Apartments differed substantially from the description of the property in the Harris County records.

Mr. Boyd responded to petitioner's allegations in a letter dated December 28, 1990.  Mr. Boyd recounted that Mr. Suiter had not been anxious to extend the deadline for the closing of the sale of Skylane Apartments but that petitioner had been "insistent".  Mr. Boyd observed that petitioner "was always optimistic that financing would be obtained".  Mr. Boyd also observed that both addenda to the Earnest Money Contract contained specific disclaimers concerning the accuracy of the financial data that was made available by Mr. Suiter.  Finally, Mr. Boyd stated that Mr. Suiter refused to refund the $55,000.

After Mr. Trueheart's letter dated December 20, 1990, there were no further oral or written demands made by petitioner or Mr. Trueheart on Mr. Suiter for the refund of the $55,000.  Further, petitioner had no communication with Mr. Trueheart after 1990,

and Mr. Trueheart did not render any services for petitioner after 1990.

Petitioner paid Mr. Trueheart $1,000 in December 1990 for Mr. Trueheart's services. Petitioner did not pay Mr. Trueheart any further amount.

Petitioner continued to engage in the commercial real estate market in 1991 and 1992. Petitioner reported income and expense from his commercial real estate activities for those years on Schedules C (Profit or Loss from Business). On his Schedule C for 1991, petitioner deducted travel expense in the amount of $9,509.

In mid-1992, approximately 1-1/2 years after Mr. Trueheart's letter dated December 20, 1990, petitioner flew to Texas and met with Mr. Trueheart's associate Dan Bendinger (Mr. Bendinger) ostensibly to discuss options for recovering the $55,000. Mr. Bendinger reported to petitioner that no work had been performed on petitioner's case since 1990 and that the prospects of recovering $55,000 from Mr. Suiter were poor.

Petitioner never filed a lawsuit to recover any amount from Mr. Suiter.

On his Schedule C for 1992, petitioner deducted a loss in the amount of $30,000 for "exten[s]ion consideration fee to Darby Suiter of Houston, Texas for investment purchase". Petitioner did not deduct on his 1992 Schedule C the additional $25,000 fee paid to Mr. Suiter in 1990.

Petitioners reported zero taxable income on their income tax return for 1992, and they paid no income tax for that year.

In the notice of deficiency, respondent determined that petitioner's transaction with Mr. Suiter "closed" in 1990 and that the $30,000 loss was therefore not deductible in 1992.

In their petition, petitioners alleged that they were entitled to deduct a $30,000 loss in 1992.  Petitioners also alleged that "The additional $25,000 was not included but is alleged as an additional loss in 1992 for abandonment" and that "an additional abandonment loss in the amount of $25,000 has also occurred in 1992 resulting in a refund and carryback and carryforward loss."[3]

## OPINION

As a general rule, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Section 165(a) permits a taxpayer to deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise."  Only a loss "sustained during the taxable year" may be deducted under section 165(a).  Petitioners

---

[3]  We find that the $25,000 loss was sufficiently alleged in the petition to give respondent fair notice of the total amount of loss claimed by petitioners in this case for the taxable year in issue.

contend that a loss in the amount of $55,000 was "sustained" in 1992. Respondent contends to the contrary. We agree with respondent for the following reasons.

In order to be deductible under section 165, "a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year." Sec. 1.165-1(b), Income Tax Regs; see also sec. 1.165-1(d)(1), Income Tax Regs. A loss is not sustained during the taxable year if "there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery". Sec. 1.165-1(d)(2)(i) and (3), Income Tax Regs. In this event, the deductibility of a loss is postponed until the taxable year in which "it can be ascertained with reasonable certainty whether or not such reimbursement will be received." Sec. 1.165-1(d)(2)(i), Income Tax Regs; see sec. 1.165-1(d)(3), Income Tax Regs. "Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances." Sec. 1.165-1(d)(2)(i), Income Tax Regs. Petitioners bear the burden of proof on this question of fact. Rule 142(a); INDOPCO, Inc. v. Commissioner, supra at 84; Welch v. Helvering, supra at 115.

We hold that petitioner failed to prove that he had a reasonable prospect of recovering any part of the $55,000 from Mr. Suiter after 1990.

At trial, petitioner alleged that Mr. Suiter should have known that petitioner would be unable to obtain financing for the purchase of Skylane Apartments. Thus, petitioner alleged as a basis for the recovery of the $55,000 amount that he was misled by Mr. Suiter.

We are not persuaded by petitioner's allegations regarding being misled by Mr. Suiter. First, an individual with 40 years of experience in the commercial real estate market should be familiar with the problems of obtaining real estate financing. Moreover, petitioner testified at trial that he was aware of the difficulties in obtaining financing specific to the real estate market in Texas at the time that he signed the Earnest Money Contract.

There is no persuasive evidence in the record that supports petitioner's allegation that he was misled by Mr. Suiter. To the contrary, the record contains direct evidence that petitioner was motivated by his own sense of optimism to extend the Earnest Money Contract. Thus, when petitioner was unable to meet the original closing date deadline of August 8, 1990, it was petitioner who requested an extension. Also, in signing the First Addendum, petitioner falsely represented that financing had already been obtained. When petitioner was unable to close the transaction by October 19, 1990, petitioner again requested an extension of the closing date. At trial, petitioner testified that he was motivated to extend the closing date deadline from

October 19, 1990 to November 19, 1990, because he thought he had some potential financing options. Subsequently, when petitioner was unable to meet the November 19, 1990 deadline, and after he requested another extension, petitioner was cautioned by Mr. Boyd. Mr. Boyd advised petitioner that Mr. Suiter was reluctant to extend the Earnest Money Contract because he was unsure that petitioner would be able to finance the purchase. Mr. Boyd observed that Mr. Suiter only agreed to extend the closing date because petitioner "insisted" that he could close by December 19, 1990. Thus, we are not convinced that it was Mr. Suiter who misled petitioner into thinking that financing was obtainable for the purchase of Skylane Apartments.

We also find that petitioner had no reasonable prospect of recovering the $55,000 based on the allegations set forth in Mr. Trueheart's letter dated December 20, 1990. In his letter, Mr. Trueheart alleged that Mr. Suiter provided petitioner with inaccurate information concerning Skylane Apartments.

The record clearly demonstrates that Mr. Suiter specifically disclaimed warranties with respect to his records. Both addenda to the Earnest Money Contract advised petitioner that he should not rely on the seller's records but should perform his own independent analysis of Skylane Apartments. For example, the Second Addendum stated:

> SELLER IS CONVEYING THE PREMISES AS IS WHERE IS.
> ALL WARRANTIES OF EVERY KIND WITH RESPECT TO THE
> PREMISES, THE FINANCIAL CONDITION OF THE PREMISES,
> THE BOOKS AND RECORDS OF THE SELLER, PROFIT AND LOSS

STATEMENTS, BALANCE SHEETS, ARE HEREBY DISCLAIMED * * *
BUYER AGREES THAT BUYER WILL HAVE ITS OWN INDEPENDENT
AUDITORS, FINANCIAL EXPERTS, TAX ADVISORS, ATTORNEYS,
ACCOUNTANTS TO REVIEW THE BUSINESS OPERATIONS AND BUYER
WILL SATISFY BUYER'S SELF, WITHOUT RELIANCE UPON ANY
INFORMATION BY SELLER, AS TO WHETHER BUYER INTENDS TO
PURCHASE THE PROPERTIES OR NOT.

Petitioner was also cautioned by Mr. Boyd about relying on Mr. Suiter's records. Although Mr. Boyd's letter dated November 20, 1990, contained information about the occupancy of Skylane Apartments, Mr. Boyd's letter specifically warned petitioner not to rely on the information presented but rather to perform his own "independent analysis". Certainly with his many years of commercial real estate experience, petitioner had reason to heed the disclosures in the addenda and the warnings in Mr. Boyd's letter. Therefore, we cannot find that petitioner reasonably relied on the information provided by Mr. Suiter or that petitioner had a reasonable prospect of recovering the $55,000 based on a theory that he was provided with inaccurate information.

Finally, petitioner alleged at trial that he continued to pursue the recovery of $55,000 from Mr. Suiter until 1992. To the contrary, we find that petitioner failed to pursue seriously the recovery of such amount after December 1990. Indeed, after Mr. Trueheart's letter dated December 20, 1990, there were no further demands made for the refund of the $55,000 (much less the commencement of any litigation).

At trial, petitioner alleged that he made some telephone calls to Mr. Trueheart concerning his claims. However, petitioner admitted that his telephone calls were unanswered, and he did not persist in making contact with Mr. Trueheart.

At trial, petitioner also alleged that he had health problems that prevented him from actively pursuing his claim against Mr. Suiter until 1992. Despite these allegations, petitioner was actively involved in the commercial real estate market in 1991. Indeed, on his Schedule C for that year, petitioner deducted travel expense in the amount of $9,509. Thus, we cannot credit petitioner's allegation that health problems prevented him from pursuing his claims against Mr. Suiter in 1991.

Based on the foregoing, we find that petitioner had no reasonable prospect of recovering the $55,000 from Mr. Suiter after 1990. We uphold respondent's determination that petitioner's loss from the transaction with Mr. Suiter was not sustained in 1992. Petitioner's loss is therefore not deductible in 1992.

To reflect our disposition of the disputed issue,

<u>Decision will be entered</u>

<u>for respondent.</u>